THE NASSAU BANK, Appellant, *v.* JOHN J. JONES, et al., Executors, etc., Respondents.

A banking corporation chartered under the laws of this State has no power to subscribe for the stock of a railroad corporation.

A State bank cannot enforce against any one an executory contract which it was not authorized by its charter to make.

The D. & R. G. R. R. Co. published a circular proposing to issue bonds of $1,000, each, at ninety per cent, secured by mortgage on its property, and to deliver one bond with five shares of its capital stock to any person advancing thereon $900. J., defendant's testator, subscribed for and was awarded $90,000 of such loan ; it had previously been agreed between him and the plaintiff, a moneyed corporation organized under the act of 1838 (Chap. 260, Laws of 1838), that to the extent of one-half the amount awarded to him he would subscribe for the same for the benefit and in the name of the plaintiff. In an action, among other things, to recover one-half the profits made by J., in the transaction, *held*, that whether the proposition of the railroad company contemplated

a loan or a sale of the stock and bonds, the subscribers became absolute owners of the stock and incurred the liabilities of stockholders; that the contract was not authorized by the statute under which plaintiff was organized and was one which it was precluded by public policy from making; and, as the contract was wholly an executory one, plaintiff could not enforce the same.

*Bissell* v. *M. S. & N. I. R. R. Co.* (22 N. Y. 258), *W. A. Co.* v. *Barlow* (63 id. 62), *Woodruff* v. *E. R. Co.* (93 id. 618), distinguished.

(Argued January 28, 1884; decided February 26, 1884.)

APPEAL from judgment of the General Term of the Superior Court of the city of New York, entered upon an order made April 9, 1883, which affirmed a judgment in favor of defendants, entered upon a decision of the court on trial at Special Term. (Reported below, 17 J. & S. 498.)

This action was brought against defendants as executors of the will of Daniel Jones to compel them to transfer and deliver to plaintiff fifty $1,000 bonds and one hundred and twenty-five shares of the stock of the Denver and Rio Grande Railroad Company, or to account for and pay over the value thereof and all interest and dividends received by their testator thereon.

The material facts are stated in the opinion.

*Samuel Hand* for appellant. The subscription or agreement made by Jones on behalf of the bank, and as its agent, to loan $45,000 on the credit of the bonds to be issued to secure the loan and the other conditions of the prospectus was within its powers and valid. (Laws of 1838, chap. 260, § 18, p. 249; R. S. of U. S., § 5136; *Third Nat. B'k* v. *Boyd*, 44 Md. 47.) The objection that the transaction proposed by the bank, and actually executed in its behalf by one of its directors was *ultra vires*, it was not permissible for a director to raise in order to keep to himself unjustly the benefits of a contract made as agent. (Perry on Trusts, § 429; *Ormiston* v. *Olcott*, 84 N. Y. 339; *King* v. *Talbot*, 40 id. 76; *Bissel* v. *M. S. R. R. Co.*, 22 id. 258; *Atlantic B'k* v. *Savery*, 82 id. 291, 307; *R. R. Co.* v. *Durant*, 95 U. S. 576; *Imperial, etc., Ass'n* v. *Coleman*, L. R., 6 H. of L. 199; *Pratt* v. *Short*, 79 N. Y. 440; Ultra Vires [Green's ed.], 784.)

*Martin J. Keogh* for respondents.   The business of banking can only be carried on by the plaintiff by performing the acts and exercising the powers expressly conferred and enumerated by the statute, and the transaction set forth in the complaint can only be upheld as legal by being brought within the scope and meaning of the acts authorized to be performed by its express provisions.   (Morse on Banking, 5; *People* v. *Utica Co.*, 15 Johns. 383; *N. Y. Fireman's Ins. Co.* v. *Ely*, 2 Cow. 699; ·2 Kent's Com. 298.)   The transaction was not a banking discount.   (*Atlantic State B'k* v. *Savery*, 82 N. Y. 302; *N. Y. F. Ins. Co.* v. *Ely*, 2 Cow. 699; *Talmage* v. *Pell*, 7 N. Y. 328.)   It was not a loaning of money on real and personal security within the meaning of the banking act.   (*Talmage* v. *Pell*, 7 N. Y. 328; *Tracy* v. *Talmage*, 14 id. 162; *Utica Ins. Co.* v. *Scott*, 19 J. R. 1; *Utica Ins. Co.* v. *Kip*, 8 Cow. 20; *Utica Ins. Co.* v. *Cadwell*, 3 W. R. 573; *L. & F. Ins. Co.* v. *Mechanics' F. Ins. Co.*, 7 id. 31; *Beach* v. *Fulton*, 3 id. 573; *Pratt* v. *Short*, 79 N. Y. 437; *U. S. Trust Co.* v. *Brady*, 20 Barb. 121; *Schermerhorn* v. *Talman*, 14 N. Y. 117; *De Kay* v. *Waddell*, 2 Sandf. Ch. 527; Ency. Britt. Banking, 329.)   The legislation of this State on the subject of banking, prior and subsequent to the passage of the act of 1838, furnishes conclusive evidence that it was never intended to permit a bank, such as the plaintiff, to use the funds of its depositors in the traffic of stocks.   (Laws of 1837, chap. 360; Laws of 1854, chap. 329, § 13; Laws of 1862, chap. 62, § 1.)   There was no transaction on the part of the bank by which Jones was authorized to subscribe on its behalf.   (*Livingston* v. *Lynch*, 4 Johns. Ch. 573; *D'Arcy* v. *Tanar Co.*, L. R., 2 Exch. 158; *Bosanquet* v. *Shortridge*, 4 Ex. 698; *Shortz* v. *Unangst*, 3 W. & S. 45; *Commonwealth* v. *Cullen*, 13 Penn. St. 133; *Langolf* v. *Seiberlitch*, 2 Pars. Eq. Cas. 64, 74.)

RUGER, Ch. J.   The question involved in this case, as we regard it, is the right of a banking corporation chartered under the laws of this state to subscribe for the stock of a rail road corporation.

In the spring of 1879, the Denver and Rio Grande Railroad Company, being a corporation organized to construct railroads in Colorado and adjoining territories, with the view of raising money to extend its lines, published a circular, whereby it proposed in substance, to issue $5,000,000, of its bonds, in sums of $1,000 each, payable thirty years after date, with annual interest at seven per cent in gold, secured by mortgage upon its property; and to deliver one of such bonds together with five shares of its capital stock, of the par value of $100, per share, to each and every person who should advance thereon the sum of $900, reserving, however, the privilege to the railroad company, of withdrawing the proposition, when it should have received subscriptions to said loan, to the amount of $3,000,000. This proposal was favorably received, and the loan was subscribed for by citizens and corporations in various States of the union, to an amount greatly exceeding the sum required by the railroad company. Among others the defendants' testator, one David Jones, subscribed for, and was awarded $90,000, of such contemplated loan. It is claimed by the appellant, and was found as a fact by the trial court, that Jones undertook, by the authority and for the benefit of the plaintiff, to contract with this railroad company, for a loan, under its proposal, in the name of the plaintiff, to the extent of one-half of the amount which should be allotted to him; and by this action the appellant seeks to recover, from Jones' executors, among other things, the profits claimed to have been made by him upon its share of the transaction. The right to maintain the action seems to depend upon the power of the bank to enter into the proposed contract, for if it had no lawful authority to make such a contract it could not become liable to Jones upon its obligation to take and pay for the property contracted for; and consequently there would be no consideration for Jones' undertaking to subscribe for the benefit of the bank. Not only this, but the bank could not, by suit, enforce against any one an executory contract which it was unauthorized by its charter to make.

It becomes necessary, therefore, to inquire into the nature

of the proposed contract, and the legal capacity of the plaintiff to transact businesss.

The proposition of the railroad company contemplated either a loan of money, or a sale of its stock and bonds; and the view we take of the case does not render it material to determine which construction should be given. By whatever name it be called, the transaction contemplated that its subscribers should become the legal owners of the certain stock and bonds thereby offered to be disposed of.

If it be regarded as a loan, the subscriber would receive the bonds with their mortgage security, as an evidence of the company's indebtedness to him; and the stock as a bonus to induce the making of the loan. On the other hand, if it be considered as a purchase of the stock and securities of the railroad corporation, the subscriber becomes the owner of such stock and bonds upon complying with the conditions of the proposition.

In either event he becomes the absolute owner of the property proposed to be delivered in exchange for the money advanced, and acquires all the rights and privileges, and subjects himself to all the liabilities of such proprietorship.

The acquisition by the railroad of a new class of stockholders, was as much a part of the scheme as the creation of a debt; and its proposition to loan money could not be availed of, under the terms of the offer without necessarily involving an acceptance of the privileges, and incurring the liabilities of a stockholder. The offer of this stock was a material part of the proposition, and was undoubtedly largely relied upon as an inducement to investors. The increase of creditors and stockholders would proceed *pari passu*, under this scheme; and the subscribers to the loan might, in case of the company's insolvency, eventually, as the owners of its stock, be compelled to contribute to the payment of its debts.

It is clear that a banking corporation cannot enter into a contract of this character, unless it has authority under its charter to become a subscriber for the stock of railroad corporations,

and thereby assume the obligations to which stockholders are subject by statute. (*Adderly* v. *Storm*, 6 Hill, 624.)

It is scarcely conceivable that it can be seriously urged, that a moneyed corporation, having under its charter the right to transact a banking business only, may legally engage, as a corporation, in the construction of railroads, or in furnishing money for such an object, in exchange for the stock of a railroad corporation, and yet when this case is analyzed and stripped of its irrelevant details and circumstances, we cannot see why this is not precisely what was attempted by the plaintiff.

This action is brought upon the theory that Jones was, in making the subscription in question, the agent of the plaintiff, and it thereby seeks to charge the defendants, as Jones' executors, with a trusteeship for its benefit, of a large quantity of the stock of the railroad corporation, for which it asks the defendants to account to it, as the owners thereof.

The complaint assumes, that the plaintiff, in 1879, became the equitable owner of a large amount of such stock, acquired by virtue of an original subscription therefor made with the company issuing the stock; and that it has ever since been the equitable owner, and is now entitled to demand the immediate delivery and possession of such stock.

Assuming the validity of the contract relied upon by the plaintiff, it has been for several years a stockholder in the railroad company, and has thereby become answerable as such stockholder, for a moiety at least, of any sum which Jones might be required to pay, through any statutory liability for the debts of the corporation. (*Stover* v. *Flack*, 30 N. Y. 64.)

Even a cursory view of the provisions of the statute under which the plaintiff was organized, and the cases giving construction to the powers thereby conferred, renders it quite clear, that the contract under which the plaintiff claims was not only *ultra vires*, but contrary to public policy.

The plaintiff is a moneyed corporation, organized under chapter 260 of the Laws of 1838, and authorized by that statute to "carry on the business of banking, by discounting bills, notes, and other evidences of debt; by receiving deposits; by

buying and selling gold and silver bullion, foreign coins and bills of exchange, and by loaning money on real and personal property."

The legislature intended by the act in question to inaugurate in this State an entirely new system of banking, and thereby undertook to provide for the establishment of moneyed corporations which should furnish to the public a safe and reliable circulating medium for the transaction of its business, and secure and solvent depositaries for the custody of such moneys as were needed for current use by the business public. (*Schermerhorn* v. *Talman*, 14 N. Y. 117; *Leavitt* v. *Blatchford*, 17 id. 526.) The solvency of these institutions was guarded by special provisions and limitations in the act authorizing their incorporation, and has ever since been the object of sedulous care, both on the part of the legislature and of the courts. (Chap. 360, Laws of 1837; chap. 329, Laws of 1854; chap. 62, Laws of 1862.) The language employed in the act defines their power and duties, and excludes by necessary implication a capacity to carry on any other business than that of banking, and the adoption of any other methods for the prosecution of such business than those specially pointed out by the statute. (*Pratt* v. *Short*, 79 N. Y. 440; Morse on Banking, 5; *Talmage* v. *Pell*, 7 N. Y. 347; *People* v. *Utica Ins. Co.*, 15 Johns. 383.) In the latter case banking powers were defined, generally, as the right to issue bills, negotiate notes and receive deposits; and in *Pratt* v. *Short* (*supra*) Judge ANDREWS describes the principal functions of a banking corporation to be to " issue notes to circulate as money, and discounting commercial paper." The business of banking, as defined by Webster, is the establishing of a common fund for lending money discounting notes, issuing bills, receiving deposits, collecting the money on notes deposited, negotiating bills of exchange," etc. The implied restrictions upon the corporations formed under the act of 1838 against transacting any other business than that of banking, and the careful definition given to that word, not only by lexicographers but in the reported cases,

would seem clearly to establish a want of authority in such corporation to engage in any business transactions excepting such as relate to the collection of business paper, the buying and selling of coin and exchanges, and the loaning of moneys upon the securities pointed out by the statute. Certainly the utmost liberality in the construction of the powers given to these corporations would not include the rights claimed for them in this case. The character and quality of the securities in which they are authorized to employ their moneys, and the nature of the business in which they are privileged to engage have frequently been the subject of discussion in our courts, with the same uniform tendency to so interpret the law as to limit their business operations, and confine their loans and investments to such transactions as should best promote their security and solvency. (*Crocker* v. *Whitney,* 71 N. Y. 161 ; *Schermerhorn* v. *Tallman, supra.*) The spirit of the law, as well as a sound public policy, forbid these institutions from risking the moneys intrusted to their care in doubtful speculations or enterprises.

The great change made in the financial business of the country by the establishment of the National banking system has not altered the policy of the law regarding the institutions organized under the State system of banking, although it has much restricted the number of corporations subject to its application.

The protection of the public from the disastrous consequences which are to be apprehended from an unsound banking system is just as necessary now as formerly, and requires the application of the same principles that distinguished our jurisprudence when the State banks were the exclusive agents in our financial system.

For these reasons, we are of the opinion that the plaintiff was not only precluded by public policy, but was not authorized by the statute under which it was organized, to enter into any engagement as a stockholder in a railroad corporation.

The contract between the plaintiff and Jones was wholly executory, and nothing has occurred thereunder, preventing the

bank from setting up its own want of authority to make such a contract, as a defense to any action brought thereon by Jones.

While executed contracts, made by corporations in excess of their legal powers, have, in some cases, been upheld by the courts, and parties have been precluded from setting up, as a defense to actions brought by corporations, their want of power to enter into such contracts (*Bissell* v. *M. S. & N. I. R. R. Co.*, 22 N. Y. 258; *Whitney Arms Co.* v. *Barlow*, 63 id. 62; *Woodruff* v. *E. R. Co.* 93 id. 618), this doctrine has never been applied to a mere executory contract which is sought to be made the foundation of an action, either by or against such corporations. It was said by Judge SELDEN, in *Tracy* v. *Talmage* (14 N. Y. 179), "That a contract by a corporation, which it has no legal capacity to make, is void and cannot be enforced, it would seem difficult to deny." In *White* v. *Buss* (3 Cushing, 448), Chief-Justice SHAW lays down the rule as follows: "It is well settled by the authorities that any promise, contract or undertaking, the performance of which would tend to promote, advance or carry into effect an object or purpose which is unlawful, is in itself void and will not maintain an action.

Lord MANSFIELD, in *Smith* v. *Bromley* (Douglas, 696), says: "If the act is in itself immoral, or a violation of the general laws of public policy, then the party paying shall not have this action." In *Tracy* v. *Talmage* (*supra*, 217), Judge COMSTOCK says: "It is admitted that the contract of a corporation, which it has no legal capacity to make, cannot in its terms be enforced."

There is nothing in this case to exempt the plaintiff from the operation of the general principle determined in the cases referred to.

Jones owed no duty to the plaintiff, except that which sprang out of his engagement to purchase the stock and bonds in question; and that having failed on account of its illegality, left no enforceable obligation resting upon him. (*Levy* v. *Brush*, 45 N. Y. 589.) There is no pretext for the claim that the contract was in any respect an executed one, for

Jones never even éntered upon its performance. His subscription for the loan-in his own name was in direct violation of the obligation which it is claimed that he had assumed; and it is that obligation alone which is sought to be enforced in this action. The bank, by the transaction in question, secured Jones' promise to do certain things, and has relied solely upon that promise. It has done nothing in performance of the contract, and, so far as it is concerned, the contract remains wholly executory.

Neither can Jones be treated as a trustee for the benefit of the plaintiff, a trust whereby it is attempted to accomplish an illegal purpose, is quite as objectionable as a direct contract to effect the same object.

The law does not raise an implied obligation to effectuate a purpose which is forbidden, and which cannot be effected by the parties through the agency of an express contract. (Perry on Trusts, § 214.)

The claim here is that a trust should be implied to enable the plaintiff to reap the profits from a transaction in which it was not authorized by law to engage. We have found no authority which supports such a claim and are unable to discover any ground upon which this action can be maintained.

It follows that the judgment should be affirmed.

All concur, except RAPALLO and EARL, JJ., dissenting.

Judgment affirmed.